**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
                                                    )
JANET O'MEARA                                       )
                                                    )
                                                    )
    Plaintiff,                                      )          Civil Action No. 19-2130 (DLF)
                                                    )
                                                    )
    v.                                              )          <u>JURY DEMANDED</u>
                                                    )
                                                    )
RYAN D. MCCARTHY, SECRETARY,                        )
U.S. DEPARTMENT OF THE ARMY,                        )
                                                    )
                                                    )
    Defendant.                                      )
                                                    )
_____ )

<u>**AMENDED COMPLAINT**</u>
**Disability Discrimination, Workplace Harassment, Retaliation, Failure to Accommodate,**
**and Failure to Interact in Violation of the Rehabilitation Act of 1973, as amended;**
**Violation of the Telework Enhancement Act of 2010**

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiff Janet O'Meara

respectfully submits her amended complaint within the twenty-one (21) day period prescribed by

the rule.  Without serving an Answer, the Government has submitted a responsive pleading

asserting a 12(b)(3) defense less than 21 days ago.  The amended changes are limited only to the

Parties and Jurisdiction & Venue paragraphs below for the purpose of clarifying the statutory

basis for this Court for establishing venue in the District of Columbia.  Plaintiff Janet O'Meara,

by and through her attorney, Jonathan Bolls, and for her Complaint states to this Honorable

Court as follows:

1.  Ms. O'Meara is a thirty-year federal employee and rose to the level of GS-14 as a Senior Procurement Analyst.  In **May 2014** she became a Senior Procurement Analyst for the U.S. Army Corps of Engineers' ("USACE") Principal Assistant Responsible for Contracting ("PARC") Winchester office ("PARC-WIN" office) a small office of only a handful of analysts.  She has received performance awards in 19 of the last 20 years of service and received the highest rating on a three-point scale, or second highest on a five-point scale, in all of those ratings except for one.  Since 1999 Ms. O'Meara has privately suffered from Generalized Anxiety Disorder, Bipolar Disorder, and Attention Deficit Hyperactivity Disorder.  After a doctor made an adjustment to her medication regimen in **March 2015,** she suffered a severe reaction which unfortunately took place in the workplace in which she was found sitting on the floor disoriented and cleaning up persistently around her work space.  Her direct supervisor witnessed this and immediately initiated a defamation campaign against Ms. O'Meara by making statements to colleagues both in and out of the office describing Ms. O'Meara as violent and incompetent and disclosing protected health information.  All of this took place with the full knowledge and consent of the superior of this supervisor as well as that superior's own supervisor.  Ms. O'Meara then became the victim of harassment at work.  Upon filing her first ever EEO complaint, conditions only got worse as the supervisors circumvented the agreed teleworking arrangement brokered by EEO.  Letters from her doctors were requested of Ms. O'Meara but then, once received, were disregarded despite the pleadings at times by the doctor to the supervisors to help Ms. O'Meara heal, by such simple requests as placing instructions in writing and teleworking five days a

week.  Despite her best attempts to cope with the harassment and seek help or reassignment, help would never come and her anxiety naturally and inevitably rose to the point that she underwent a partial hospitalization for a week in October 2015 and again in April 2016 for a week.  She furthermore was placed on medical leave from early October 2016 to late January 2016 as requested by her therapist and doctor.  During what should have been the interactive process, Ms. O'Meara repeatedly invited her supervisor to act on her Family Medical Leave Act application or work out some other arrangement so that she could return to a safe working environment that would allow her to heal, but she was coldly ignored and then terminated for excessive absences, absences which were caused by the malicious conduct of a supervisor and the negligent supervision of that supervisor.

## PARTIES

2.  Plaintiff is a resident of Mansfield, MO.

3.  Defendant United States Army is a federal department responding for the acts or omissions of its agency, the United States Army Corps of Engineers, whose headquarters is located at 441 G Street, Washington, D.C.  20314, and is a federal employer within the meaning of 29 U.S.C. §701.

## JURISDICTION & VENUE

4.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States, specifically the Rehabilitation Act

of 1973, as amended, 29 U.S.C. §701 et seq., and the Telework Enhancement Act of 2010.

5.  Venue properly lies in this Court pursuant to 42 U.S.C. §2000e-5(f)(3) which states that Title VII actions (which remedies, procedures, and rights are incorporated by the Rehabilitation Act for the instant case) "may be brought in the judicial district in which the employment records relevant to such practice are maintained and administered."

6.  The Department of the Army is responding for the acts or omissions of its agency, the Army Corps of Engineers, whose headquarters is located on 441 G Street, N.W., Washington, D.C.  20314-1000.  *See* https://www.usace.army.ml/Contact.aspx (last accessed November 12, 2019).

7.  Ms. O'Meara's office, known as the Principle Assistant Responsible for Contracting (PARC), was a small higher echelon *headquarters* office comprised of just eight headquarters personnel assigned to an *offsite* location in Alexandria, VA.  As such, there was no Army Corps of Engineers personnel office in Virginia that serviced her particular office when she worked there either for medical documentation, performance appraisals, and/or official personnel records (SF-50's, SF-52's, etc.). She was rather serviced by the Civilian Personnel Advisory Center in D.C.

8.  Although EEO cases are normally handled by the regional EEO office, in Ms. O'Meara's case the Army Corps of Engineers' EEO office from Washington DC, not Virginia, was assigned to her complaint.  When she initially sought assistance from the EEO office in Alexandria, VA she was directed to Washington DC because

her case fell under headquarters level jurisdiction.  Therefore Mr. Newton, a HQ level EEO official from Washington DC, was assigned to her case.

9. The EEO office in Washington DC successfully preserved the lion's share of documents relevant to this case now contained in a 600-page Report of Investigation and Investigative File.  This comprehensive report represents the Government's sole investigation into Ms. O'Meara's case and includes sworn statements from witnesses, key correspondence during the interactive process directly relevant to this case, and numerous other pieces of evidence that are not and cannot be maintained in the Official Personnel File.

10. Ms. O'Meara's EEO files are kept and maintained at the Army Corps of Engineers' EEO office in the GAO Building in Washington DC.  Judy Poole and Tabatha Holloway, from the Army Corps of Engineers EEO office at the GAO Building in the District, each separately confirmed her file is located there in Washington DC.

11. No records as it relates to Ms. O'Meara's employment with the Army Corps of Engineers are kept either at the Alexandria, VA location of the Principle Assistant Responsible for Contracting (PARC), now known as Senior Contracting Officer (SKO), or at the Civilian Personnel Advisory Center in Fort Belvoir, VA.  Jacqueline Woodson (GS-15), now in charge of the SKO office in Alexandria, VA has confirmed no records whatsoever pertaining to Ms. O'Meara's employment were left for her, EEO or otherwise.  Mr. Dwayne Hellam, Director of the Fort Belvoir Civilian Personnel Advisory Center, likewise searched for any record on Janet O'Meara but found none.  He instead directed Ms. O'Meara to Army Corps of Engineers' own Civilian Personnel Advisory Center, located in Washington D.C.

12. Ms. O'Meara no longer holds any residence anywhere in Virginia, but has moved to Missouri approximately one year ago.  This move occurred as a direct result of her termination of employment after thirty years of service.

13. Certain key witnesses in the case are from or work in Washington DC.  Thomas Janisko, a medical officer and witness for the Plaintiff, was working out of Washington DC.  Earl Newton, the EEO investigator, was based in Washington DC.  Robin Baldwin (GS-15), witness for the Plaintiff, was working in Washington DC as was Stewart Hazlett (SES), Ms. O'Meara's second-line supervisor.  John Teetsov, Ms. O'Meara's first-line supervisor, was promoted and no longer working at the PARC office in Alexandria.

14. Venue in the District would not be burdensome or prejudicial to the Government's defense.  Any witnesses associated with the Alexandria, VA location would be about as close to D.C. as geographically possible; historically, Alexandria fell within the confines of the District of Columbia.

15. On **September 4, 2015** Ms. O'Meara filed her formal complaint with the U.S. Equal Employment Opportunity office which led to her filing charges with the Equal Employment Opportunity Commission.  In her charges she alleged disability discrimination, workplace harassment, retaliation for filing an EEO complaint, failure to accommodate, and failure to engage in the interactive process, which led to her effective termination.

16. More than 180 days have elapsed since Ms. O'Meara filed her charge with the EEOC.

17. Ms. O'Meara exhausted her administrative remedies under the Rehabilitation Act of
    1973.


## FACTS GIVING RISE TO RELIEF

18. Janet O'Meara is a thirty-year federal employee with a long and distinguished career
    and has never filed a claim for discrimination or any kind of grievance before.  She
    began work for the Army Corps of Engineers' Principal Assistant Responsible for
    Contracting ("PARC")- Winchester ("WIN") office as a senior Procurement Analyst
    (GS-14) in May 2014.  Her role was to ensure legal and regulatory compliance for
    high dollar contracts in support of domestic and overseas operations and to ensure
    that competent, qualified Procurement professionals receive Contracting Officer's
    Warrants.

19.  She has received performance awards in 19 of the last 20 years of service and
    received the highest rating on a three-point scale, or second highest on a five-point
    scale, in all of those ratings except for one.

20. Since 1999 Ms. O'Meara has privately suffered from Generalized Anxiety Disorder,
    Bipolar Disorder, and Attention Deficit Hyperactivity Disorder.

21. The PARC-WIN office command structure had on paper John Teetsov (GS-15) as
    Ms. O'Meara's first-line supervisor; however, on her first day of work it was made
    clear to Ms. O'Meara that Valerie Mills-Diggs (GS-14) was delegated full authority
    by Mr. Teetsov to exercise supervisory duties over the office and that she was, for

all intents and purposes, the actual first-line supervisor and Mr. Teetsov was the second-line supervisor.

22. Valerie Mills-Diggs assigned Ms. O'Meara work, took her sick calls, and had input in O'Meara's performance evaluations.  Ms. O'Meara was instructed by Mr. Teetsov from the beginning never to report to Mr. Teetsov but instead to Valerie Mills-Diggs. There have been instances where O'Meara attempted to go directly to John Teetsov, only to be scolded and directed back to Valerie Mills Diggs.

23. Initially Ms. O'Meara got along just fine with Mills-Diggs.  She came over to Ms. O'Meara's house, they went on work breaks together, and they exchanged collegial text messages and went out to dinner together.

24. In **March 2015**, eleven months into her job at PARC-WIN, Ms. O'Meara experienced a severe reaction to an adjustment in her medication at the workplace, which led to an unfortunate physical reaction at the workplace.  She was observed by her co-workers sitting on the floor and disoriented.

25. Several of her co-workers observed her in this state, including Valerie Mills-Diggs. USACE Command Surgeon Thomas Janisko was called out to assist, who was also able to make observations of Ms. O'Meara.

26. Significantly, Command Surgeon Janisko was able to confirm the non-violent characteristics of O'Meara's condition, which he relayed to Valerie Mills-Diggs and Mr. Teetsov directly.

27. Command Surgeon Janisko further advised Mr. Teetsov that he expects the isolated incident to have no detrimental effect on O'Meara performing any of her essential job functions, and after a few days of rest and time for the medication that caused

the detrimental reaction to get out of her system completely she should be at full performance level once again.

28. Upon Ms. O'Meara's return from a pre-scheduled week off following the incident, Valerie Mills Diggs entered Ms. O'Meara's workspace, pulled a 1.5x2''post-it note off of her PC, a note bearing Mills-Diggs' name that was obviously a work assignment, and *with malicious intent* immediately claimed aloud to those around that this is a death threat and that O'Meara is out to get her or going to hurt her. Upon being confronted later, Mills-Diggs admitted to having given the post-it note to O'Meara herself as a reminder for a project from just one or two days prior that Mills-Diggs assigned to Ms. O'Meara.

29. Ms. O'Meara and Command Surgeon Janisko both attempted to set up a meeting with management, namely John Teetsov and Valerie Mills-Diggs, to clarify the non-violent nature of Ms. O'Meara's condition.  Both attempts were rebuffed by Teetsov and Mills-Diggs.

30. Following O'Meara's physical reaction to her medication at the office, Valerie Mills-Diggs began treating her harshly in the office including, but not limited to, the following acts or omissions:

   a) On numerous occasions, including at office meetings and office picnics, speaking loudly to groups of people about Ms. O'Meara's mental health condition and characterizing her as violent.  *See* **EXHIBIT A (Affidavit of Co-Worker Richard Augsburger).**

   b) Poisoning the well with third parties and colleagues who have a regular work relationship with Ms. O'Meara, encouraging and causing them to shun her;

c) Constantly shifting work priorities and creating artificial deadlines for administrative work for Ms. O'Meara with the intention of aggravating her mental health condition and interfering with her ability to focus on more substantial Procurement work during regular work hours that carry hard and fast deadlines;

d) Issuing confusing and conflicting instructions to Ms. O'Meara with the intention of aggravating her mental health and making her look bad in front of her colleagues and superiors;

e) Requiring excessive work updates from Ms. O'Meara well beyond what was required of her colleagues;

f) Changing the venue of staff meetings and informing everyone except for Ms. O'Meara, and then providing no briefing to update her;

g) Holding staff meetings without informing or inviting Ms. O'Meara while she was teleworking, available and willing to attend either in person or via teleconference, or providing any briefings whatsoever to keep her current or even informing her about holding them, while also using these opportunities of Ms. O'Meara's absence to say slanderous things in front of the group attempting to portray Ms. O'Meara as dangerous and incompetent due to her medical condition.

h) Berating and belittling Ms. O'Meara at every available opportunity, while acting excessively polite at times depending on the audience;

i) Divulging to third persons Protected Health Information of Ms. O'Meara on multiple occasions.

31. Ms. O'Meara complained on at least three separate occasions and held official meetings with John Teetsov about Valerie Mills-Diggs' harassment of her on the job following her adverse reaction to the medication adjustment, only to be told not to worry about it and that he is working with Mills-Diggs on it.

32. For example, on **June 5, 2015**, having been assigned a rapid turnaround contract for legal and regulatory compliance in support of U.S. forces in Afghanistan, Ms. O'Meara worked with the liaison office to make all the necessary changes.  In the middle of the day, Mills-Diggs told Ms. O'Meara to "stand down" because John Teetsov was going to finish the project himself.  Mills-Diggs then has Ms. O'Meara do busy work until 2:00 p.m. at which time Ms. O'Meara is again contacted by Mills-Diggs and instructed to go back to work on the original project and complete it by the end of the day.  Upon finding that very little substantial changes had been made in the interim, and strong indication that John Teetsov was in fact not working on the project, Ms. O'Meara volunteered to work until late at night to complete it by the midnight deadline.  Mills-Diggs then informed Ms. O'Meara that the "end of the day" was now 3:00 instead of 4:00 and since things had not been completed by that time, she would write Ms. O'Meara up for poor work performance.

33. By way of a second example, on **July 13, 2015**, Ms. O'Meara discovered that Valerie Mills-Diggs had lied to her superior about her calling in sick that day.  Ms. O'Meara called in sick and left a message for Mills-Diggs stating that she is not coming in today because of a bad headache, but if she can get rid of it, she will try to come in.  Within an hour, Mills-Diggs returns the phone call lambasting Ms. O'Meara for failing to follow OPM rules on calling in sick because Ms. O'Meara

did not state with total specificity whether she was taking sick or annual leave.  At around 12pm that day, while at home enduring what turned out to be a severe migraine headache, Teetsov called and left a message with Ms. O'Meara stating that no one knew where she was (not that *he* did not know where she was but that *no one* knew).  The voicemail followed telephone conversations between both Ms. O'Meara and Mr. Teetsov and Ms. Mills-Diggs regarding the fact that Ms. O'Meara had called in sick in accordance with OPM rules and regulations.  Ms. Mills-Diggs' statements were false, and done deliberately in order to hurt Ms. O'Meara's reputation.

34. This was markedly different treatment than the way that Randy Force, Calvin Phair, or Richard Jenkins, colleagues in the office at that time, were treated when they called in sick or for sudden emergencies.  In all those cases the venomous tone was absent, and with regard to other similar cases Mills-Diggs was known to politely ask clarification questions as appropriate.

35. Valerie Mills-Diggs has received no administrative suspension, letters of reprimand or warning, censure, or any form of official discipline for her actions as it relates to her treatment of Ms. O'Meara.

36. O'Meara appealed to her second line supervisor, Stewart Hazlett, with the help of a GS-15 (Robin Baldwin), who after speaking at length with Ms. O'Meara found her to be credible and indicated as much to Mr. Hazlett as well as the concern that Mr. Teetsov was not interceding to effectively help the situation.  Mr. Hazlett refused the meeting.

37. With the encouragement of two fellow employees, Ms. O'Meara filed an initial EEO complaint on **July 23, 2015**.

38. On **August 24, 2015** EEO Counselor Earl Newton arranged a meeting with Ms. O'Meara, Valerie Mills-Diggs, and John Teetsov at USACE Headquarters, Washington DC resulting in a Five-Day Teleworking Agreement as proposed by EEO.  *See* Teleworking Agt., **EXHIBIT B.**

39. The Teleworking Agreement was a temporary stopgap measure suggested by the EEO office to protect Plaintiff while a more permanent solution to the workplace harassment problem could be identified.

40. Ms. O'Meara started off the August 25, 2015 meeting by saying she simply wanted to be treated like everyone else, nothing special.  She also asked her superiors to be professional and not allow her to be slandered and gossiped about and to allow her to do the job she was hired to do, the way they had before they learned about her illness.  She further expressed concern that the proposed teleworking solution would make it easier for the gossip and slander to continue.

41. Ms. O'Meara did not want Telework initially, but the abuse and harassment became so vicious that Ms. O'Meara, upon realizing that the slander had already spread so thoroughly through her office, preferred not to be in their presence and accepted the 5-Day Telework Agreement as a temporary stopgap measure.

42. USACE Equal Employment Opportunity Office, by its agent Earl Newton, on August 25, 2015 did unlawfully deny Ms. O'Meara's rights to have a representative and witness at the EEO Management meeting.

43. USACE Equal Employment Opportunity Office, in collusion with and in order to protect management, by its agent Earl Newton, deliberately falsified a record memorandum to state as follows:

a)  An unnamed male friend, Ms. O'Meara's representative, was present at the meeting on August 24, 2015.   Jim Davis provided sworn testimony in a deposition that he was not present at the meeting and in fact prevented on site from attending.

b)  An unnamed male friend brought up Ms. O'Meara's medications and their affect on Ms. O'Meara.   On the contrary, conspicuously absent from the discussion was any focus on the central issue, which was the discriminatory treatment of Ms. O'Meara because of her illness.

44. USACE Equal Employment Office, in an effort to get Ms. O'Meara's case procedurally dismissed before a hearing on the merits, provided Ms. O'Meara the Rights Document, which starts the 30-day time clock to file, a full two weeks prior to the EEO Management Meeting, and had her sign and return by email.  The Rights Document is supposed to be presented at the EEO Management Meeting to allow a full 30 days to follow up with any progress in diffusing the hostile work environment/ discriminatory conduct.   This caused Ms. O'Meara's case to be summarily dismissed, forcing her to have to hire an attorney to help show all this and get the EEOC case reinstated.

45. During the intervening 30-days, at *no* time did EEO Officer Earl Newton *ever* follow up with Ms. O'Meara on the conditions of her work environment.

46. Immediately following the EEO meeting, Ms. O'Meara experienced repercussions from John Teetsov and Valerie Mills-Diggs by:

a. With malice and suddenly without explanation, in **October 2015** removing O'Meara from the Contracting Officers Review Board, which was work that she excelled in and management knew that she personally enjoyed;

b. Failing to follow through in identifying a suitable job transfer for Ms. O'Meara.

c. Purposely not assigning Ms. O'Meara her own region/or district, after she pleaded for one, while every other staff member was assigned one with respect to performing contract reviews, the bulk of her job.

d. On **September 11, 2015**, while knowing that Ms. O'Meara was hard at work in fulfilling her contractor license learning credits required to retain her certification level shortly before the time it was due, Valerie Mills-Diggs maliciously saddled her with busy work and then made that the top priority;

e. In September 2015, failing to assist or see to it that Ms. O'Meara was provided with a well-working loaner computer during the days she was teleworking when bureaucratic red tape got in the way;

f. Refusing to provide a reasonable allotment of work time to address her EEO complaint.

47. After Defendants failed and refused to take corrective measures with respect to Plaintiff's harassment at work, Plaintiff was forced to hire the services of a mental health professional on a regular and routine basis.

48. Mr. Teetsov failed to abide by the 5-day-per-week teleworking agreement reached by the parties as brokered by the EEO.  At no time did he grant more than four days per week.

49. Upon information and belief, on the days she was permitted to telework, excessive work updates were required of Ms. O'Meara that went beyond the other staff who were not teleworking, in violation of the Telework Enhancement Act of 2010, 5 U.S.C. §6503 (a)(3).   Weekly updates requirements suddenly turned into daily update requirements following the EEO Management meeting.   The day prior to a telework day, Ms. O'Meara would draft a pre-telework agenda which was approved by John Teetsov.   Valerie Mills-Diggs would then make a habit of changing this plan substantially during the day, and *multiple* times throughout the day.   She would furthermore require numerous written telework updates during the day, which was time consuming and unnecessary.   Then, in the evening a detailed telework log would have to be completed on the Share Drive and update the TAPS system, another and separate (higher echelon) database system with updates on assignments for CORBS, Contract Reviews, and Taskers requiring updating.

50. Upon information and belief, other employees who teleworked were only required to log their work into the telework log and update the TAPS system at the end of the day.

51. Plaintiff raised her concerns with John Teetsov about the excessive work updates Valerie Mills-Diggs was requiring of her while she teleworked, but again no corrective action was taken.

52. The EEO office failed to gauge compliance with the Teleworking Agreement referenced in ¶29 of this Complaint or perform any kind of meaningful follow-up to end harassment in the workplace.

53. On **October 5, 2015**, in retaliation for the filing of her EEO complaint, Defendants through their agents and subjects of the EEO complaint, John Teetsov and Valerie Mills-Diggs, conspired to prevent Plaintiff from being assigned her own region/ or district for contract reviews, which pertained more to the work that she was hired to do and comprised the greater portion of her expertise in the field of Federal Procurement than any of the other duties assigned, when in fact John Teetsov had previously promised one to her, when all others in the office except for Plaintiff were assigned one.

54. On **October 6, 2015**, in retaliation for the filing of her EEO complaint, Plaintiff was removed for no reason from the Contract Officers Review Board (CORB), a primary responsibility of hers in which she enjoyed rave reviews for her leadership and improvements to the system, when her supervisors had knowledge that she particularly enjoyed this work.

55. As a direct result of the hostilities experienced at work under Valerie Mills-Diggs and John Teetsov, Ms. O'Meara's illness became aggravated to the point that she underwent a partial hospitalization for a week and took medical leave by the recommendation of her doctor between **October 2015 and January 2016**.

56. In **January 2016**, Ms. O'Meara furnished John Teetsov with a letter from her doctor highlighting specific work accommodations that would be necessary for Ms. O'Meara's recovery, including as follows:

   a.   Telework five days a week;

   b.   All assignments and instructions be fixed in writing;

   c.   Schedule adjustments and breaks to accommodate medical treatment;

    d.   Flexible and supportive style of supervision.

57. This same letter from the doctor stated: "This accommodation may be reassessed at a future date."

58.  Nevertheless, John Teetsov and Valerie Mills-Diggs persisted in their choice not to put their instructions in writing.  Despite repeated requests in writing from the doctor, the 5-day telework week never happens. The schedule adjustments to allow for medical treatment were not allowed.  The flexible and supportive style of supervision was not adopted.  In fact, none of the suggested changes were made to accommodate Ms. O'Meara.

59. In **early October 2015**, John Teetsov offered Ms. O'Meara one and only one position, a downgraded GS-13 position in HECSA (Humphreys Engineer Center Support Activity), Headquarters in Washington, D.C.  After forcing her to make her decision in the heat of the moment, and making her wait to meet with him until after her work day ended on a day she previously informed him she had a medical appointment right after work (causing her to be late), she declined but reiterated that she would be open to, and interested in, any GS-14 position.

60. Mr. Teetsov promised to look into another opportunity instead on Ms. Robin Baldwin's (GS-15) staff that might allow her to work remotely from the same workplace location and at her same pay grade.  After Plaintiff expressed strong interest in this position, Mr. Teetsov promised to get back about it after doing more of an inquiry.  He never did.

61. On **March 10, 2016** Plaintiff delivered a follow-up letter from her doctor to John Teetsov stating as follows: "I kindly request that Ms. O'Meara be authorized to

telework 5 days a week.  This is imperative for stabilization of her symptoms and healing process.  If you have further questions, please do not hesitate to contact me."

62. Neither Plaintiff's supervisor nor anyone from Plaintiff's Agency contacted the doctor for clarification or seek Plaintiff's permission to do so.

63. Near the end of **March 2016,** the conditions of Ms. O'Meara's abusive treatment at work went unabated and aggravated her condition to the point she again was forced to take leave.

64. As of **April 19, 2016,** John Teetsov had effectively placed Ms. O'Meara on Extended Medical Leave.

65. On **April 30, 2016** Ms. O'Meara made a formal written request of John Teetsov for a job transfer to a job of an equivalent pay grade, stating she *does not feel safe* working at or for PARC-WIN.

66. On **July 27, 2016**, while John Teetsov was on leave, Jacqueline Woodson, standing in his place as the Acting Director of Contracting, stated that Ms. O'Meara failed to comply with leave protocol when in fact Ms. O'Meara was already on Extended Medical Leave as per John Teetsov's email dated **April 19, 2016**.  Importantly, Jacqueline Woodson was the one who Richard Augsburger witnessed Ms. Mills-Diggs come upstairs and approach with outrageous and defamatory comments pertaining to Ms. O'Meara's illness, which does suggest a pattern of collusion between Mills-Diggs and Jacqueline Woodson that ultimately set the stage for Ms. O'Meara's removal.  *See* **EXHIBIT A (Affidavit of Co-Worker Richard Augsburger).**

67. Regardless of the apparent conflict within her chain of command as to the leave status, Ms. O'Meara nevertheless complied with Ms. Woodson's letter by providing leave slips on numerous occasions in **August and September 2016** directly to John Teetsov, including a plea for advanced sick leave for a severe car accident on August 11, 2016 resulting in permanent injury to Ms. O'Meara.  Contrary to his duty as a supervisor, however, John Teetsov chose not to act on any of them.

68. Ms. O'Meara attempted to communicate with John Teetsov about obtaining an appropriate accommodation away from the harassment at work from **September 2016** to her removal in **2017** only to find that Defendants had shut off all communication with her and discontinued the interactive process.

69. Importantly, in addition to her response to Woodson's **July 27, 2016** letter, Ms. O'Meara also provided a Family Medical Leave Act application, certified by her doctor dated **August 16, 2016**.  The application was never acted on, despite the Agency having plenty of time until 2017 to do so prior to their decision to remove.

70. During what should have been the interactive process in 2016-17, the small PARC-WIN office brought on four new employees.

71. At least one other employee in the small PARC-WIN office has been out for extended periods of time recently; nevertheless, his job was not threatened.  This employee was out of the office and not accounted for between February and November 2015, all of June 2016, all of August 2016, and the entirety of September 2016 to April 2017.  The fact of Ms. O'Meara's unequal treatment did not escape the attention of the other employees when Ms. O'Meara was terminated for absences.

72. In light of the Agency's failure to respond one way or another on her FMLA application, her requests for advanced medical leave or leave without pay, and her request for a response on a work transfer as promised, Ms. O'Meara yet again reached out politely to the Agency on **November 29, 2016**.  Her letter did not even receive the courtesy of a reply.

73. In **September of 2017** Ms. O'Meara was removed for excessive absences.

## COUNT I

### Disability Discrimination in Violation of Section 501 of the Rehabilitation Act of 1973, as Amended

74. Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-64 of this Complaint with the same force as if set out here in full.

75. Plaintiff has a disability as defined in Section 504 of the Rehabilitation Act of 1973, as amended.

76. Defendants had notice of Plaintiff's disability.

77. Plaintiff was able to perform the essential functions of her job with reasonable accommodations.

78. Defendants failed to abide by the terms of the agreement between the Parties as brokered by the EEO office.

79. Defendants failed to abide by the reasonable instructions delivered on more than one occasion by Plaintiff's doctor to the Defendants.

80. Defendants constructively discharged Ms. O'Meara.

81. Defendants discriminated against Ms. O'Meara on account of her disability in violation of the Rehabilitation Act of 1973 as amended, 29 U.S.C. §791.

82. Defendants acted with malice and reckless indifference to Ms. O'Meara's rights.

83. As a direct and proximate cause of the discrimination to which she was subjected, Ms. O'Meara suffered and continues to suffer lost wages and benefits, humiliation, and harm to her reputation.

## COUNT II

### Hostile Work Environment Based on Disability and Retaliation in Violation of Section 501 of the Rehabilitation Act of 1973, as Amended

84. Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-74 of this Complaint with the same force as if set out here in full.

85. Plaintiff has a disability as defined in Section 504 of the Rehabilitation Act of 1973, as amended.

86. Defendants had notice of Plaintiff's disability.

87. By the delegated authority vested in Valerie Mills-Diggs, Defendants engaged in deliberate acts meant to harm the reputation of Plaintiff and defame her at office meetings, picnics, and other events.

88. By the delegated authority vested in Valerie Mills-Diggs, Defendants with malicious intent divulged Protected Health Information of Plaintiff.

89.  Defendants were given timely notice through the chain of command of the facts and circumstances supporting ¶¶21, 27, and 37 but failed to take adequate and effective remedial action to stop the discriminatory behavior.

90. As a result, Plaintiff had to endure a work environment characterized by:

a)  Extremely offensive and disparaging remarks made consistently behind her back to her colleagues, which related directly to her mental health condition;

b)  Shunning in the workplace;

c)  Shifting work priorities and assignments for no legitimate purpose and maliciously designed to aggravate Plaintiff's anxiety condition;

d)  Requiring excessive work updates throughout the day while teleworking;

e)  Threats to write Plaintiff up for conduct for which she could not have been responsible, placing her in continual fear of losing her job;

f)  Constantly being set up for failure by contradictory instructions, designed maliciously to foster miscommunications and misunderstandings with Plaintiff's superiors.

91. By the authority vested in Valerie Mills-Diggs, Defendants singled out Plaintiff and imposed excessive work update requirements above and beyond her colleagues for the days she was teleworking.

92. Defendants discriminated against Ms. O'Meara on account of her disability in violation of the Rehabilitation Act of 1973 as amended, 29 U.S.C. §791.

93. Defendants constructively discharged Ms. O'Meara.

94. Defendants acted with malice and reckless indifference to Ms. O'Meara's rights.

95. As a direct and proximate cause of the discrimination to which she was subjected, Ms. O'Meara suffered and continues to suffer lost wages and benefits, humiliation, and harm to her reputation.

## COUNT III

### Retaliation in Violation of Section 501 of the Rehabilitation Act of 1973, as Amended

96. Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-86 of this Complaint with the same force as if set out here in full.

97. After the filing of her EEO complaint, Plaintiff was harassed and intimidated by her chain of command despite the fact that telework was agreed to as a temporary reasonable accommodation in an EEO-brokered meeting between the Parties.

98. Weekly update requirements suddenly turned into excessive daily updates required of Plaintiff while teleworking following the EEO-brokered meeting.

99. Plaintiff was denied official time by her superior, John Teetsov, to work on her EEO complaint.

100. After the filing of her EEO complaint, John Teetsov suddenly aborted his attempts to secure an equivalent position for Plaintiff as promised and maliciously ignored her persistent and numerous pleadings for updates on the subject.

101. Defendants, through John Teetsov and Valerie Mills-Diggs, deliberately left out Plaintiff from communications with respect to staff meetings, both formal and informal, such as the meeting that took place on March 18, 2016 despite Plaintiff's best efforts and requests to keep and be kept informed of them.

102. Plaintiff was removed for no reason from the Contract Officers Review Board (CORB), a primary responsibility of hers in which she had received rave reviews for her leadership and improvements to the system, when her supervisors had knowledge that she particularly enjoyed this work.

103. In retaliation for the filing of her EEO complaint, Defendants through their agents and subjects of the EEO complaint, John Teetsov and Valerie Mills-Diggs, conspired to prevent Plaintiff from being assigned her own region/ or district when in fact John Teetsov had previously promised one to her, when all others in the office except for Plaintiff were assigned one.

104. In retaliation for the filing of her EEO complaint against them, Valerie Mills-Diggs and John Teetsov did encourage Jacqueline Woodson (GS-15), not in Ms. O'Meara's chain of command, to assert herself for the purpose of interfering with the Extended Medical Leave status that Ms. O'Meara had been previously placed on in April 2016 (See ¶55), thereby putting her on a trajectory toward removal.

105. In retaliation for the filing of her EEO complaint, Defendants constructively discharged Ms. O'Meara.

## COUNT IV

### Failure to Accommodate in Violation of Section 501 of the Rehabilitation Act of 1973, as Amended

106. Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-96 of this Complaint with the same force as if set out here in full.

107. Plaintiff has a disability as defined in Section 504 of the Rehabilitation Act of 1973, as amended.

108. Defendants had notice of Plaintiff's disability.

109. Defendants failed to abide by a teleworking agreement that was facilitated by the EEO between the Parties.

110. On those days that Plaintiff was teleworking, Defendants permitted Valerie Mills-Diggs to harass and intimidate her by phone and email, thereby continuing the hostile work environment from a distance.

111. Defendants failed to abide by a simple list of itemized instructions presented by Plaintiff's doctor to them on multiple occasions, none of which conflict with Agency policy.

112. Defendants failed to take any kind of corrective or disciplinary action against Valerie Mills-Diggs after her discriminatory actions were brought to their attention.

113. Defendants failed to take any steps to protect Janet O'Meara after discriminatory actions were brought to their attention.  On the contrary, they looked the other way.

114. Defendants failed to explore work transfer opportunities for an equivalent position for Plaintiff.

115. Defendants chose not to accommodate by removing Valerie Mills-Diggs from her position and instead decided to allow her hostile behaviors to continue in the hopes that Plaintiff's mental health condition would be so aggravated that she would be constructively discharged.

116. Defendants' hostile work environment was a direct and proximate cause for aggravating Plaintiff's anxiety condition.

117. The aggravation of Plaintiff's anxiety condition was a direct and proximate cause for Plaintiff's absences.

118. An accommodation away from Valerie Mills-Diggs would have prevented the aggravation of Plaintiff's mental health and the excessive absences it caused.

119. Once Plaintiff went on Extended Medical Leave, Defendants began pressing her for medical documentation, all of which she supplied in a timely manner.

120. Defendants discontinued the interactive process with Plaintiff once Plaintiff went on Extended Medical Leave, including failing to officially approve or deny leave slip requests or confirm receipt of important medical documents delivered at their own request.

121. Defendants failed to act on a timely submitted application for unpaid leave under the Family Medical Leave Act (FMLA), which would have been an appropriate common sense solution in this case.

122. Plaintiff complied with every request for medical documentation from Defendants and in a timely fashion.  At no time were there outstanding requests for medical documentation with which Plaintiff did not comply.

123. During her medical leave, Defendants hired three more replacements in the small PARC-WIN office, more than enough to handle the workload while Plaintiff recuperates.

124. Clear disparate treatment of Plaintiff occurred with respect to the grounds for her removal as another employee in the small office was treated very differently for his excessive absences and allowed to keep his job.

125. Defendants failed to accommodate Plaintiff's disability in violation of the Rehabilitation Act of 1973, as amended.

126. Defendants acted with malice and reckless indifference to Plaintiff Janet O'Meara's rights.

127. As a direct and proximate cause of the discrimination to which she was subjected, Janet O'Meara suffered and continues to suffer lost wages and benefits, humiliation, and harm to her reputation.

## COUNT V

### Excessive Work Updates Required of a Teleworker in Violation of the Telework Enhancement Act of 2010, 5 U.S.C. §6503(a)(3)

128. Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-118 of this Complaint with the same force as if set out here in full.

129. Plaintiff was a qualified teleworker approved under her Agency for teleworking.

130. On the days that she was teleworking, Plaintiff, after submitting a telework plan and reviewing it with her official supervisor John Teetsov the previous day, was then required to provide status updates several times throughout the telework day by her de facto supervisor Valerie Mills-Diggs starting as early as 8:30 or 9:00 a.m. on what had been already accomplished.

131. Valerie Mills-Diggs was hostile to the idea of teleworking.

132. The status updates were to be in writing and thorough and were rarely acceptable delivered orally by phone. They were time consuming and always disruptive to the work plan for the day.

133. Status requests were delivered to the PARC-WIN office team at large through a mass email.

134. The vast majority of status updates Plaintiff received, however, were addressed to her directly.

135. Plaintiff was treated differently while teleworking in violation of the Telework Enhancement Act as shown by acts of management discretion that were specifically designed to overburden the teleworker and discourage her from teleworking.

**WHEREFORE**, Defendants' actions were done recklessly, maliciously, and with wanton disregard to the rights of Plaintiff.  As a result, Plaintiff has been damaged.  In addition, Plaintiff is entitled to punitive damages for Defendants' willful conduct in an amount that equals or exceeds the special damages to which Plaintiff has been exposed.

**WHEREFORE**, Janet  O'Meara respectfully prays this Honorable Court:

1.  Enter judgment on her behalf against Defendants on all counts contained herein;

2.  Award Janet O'Meara immediate retirement with full benefits, back pay, and front pay;

3.  Award Janet O'Meara damages for harm to her reputation;

4.  Award Janet O'Meara punitive damages;

5.  Award Janet O'Meara her court costs, expenses, and attorneys' fees;

6.  Declare that Defendants' conduct is in violation of the Rehabilitation Act of 1973, as amended and the Telework Enhancement Act of 2010;

7.  Grant such other and further relief as this Court deems just and proper.

November 12, 2019

Respectfully Submitted,

s/   *Jonathan Bolls, Esq.*            /
Jonathan Bolls (Bar No. 994959)
6297 Levi Court
Springfield, VA  22150
(703) 593-2354
jonathanbolls@hotmail.com

*Counsel for Plaintiff Janet O'Meara*

## JURY DEMAND

Plaintiff demands a trial by jury in all issues contained herein.

s/ *Jonathan Bolls, Esq.*            /
Jonathan Bolls (Bar No. 994959)
6297 Levi Court
Springfield, VA  22150
(703) 593-2354
jonathanbolls@hotmail.com

*Counsel for Plaintiff Janet O'Meara*

## CERTIFICATE OF SERVICE

I certify that, on the date set forth below, the foregoing **AMENDED COMPLAINT** was filed electronically and is available on the Court CM/ECF system for the Parties.

Dated:  November 12, 2019

*s/ Jonathan Bolls*_____ /
Jonathan Bolls, Esq.
*Counsel for the Plaintiff*